2025 IL App (2d) 240593-U
Nos. 2-24-0593 & 2-24-0594 cons.
Order filed March 3, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* L.M., a Minor | ) | Appeal from the Circuit Court |
| | ) | of McHenry County. |
| | ) | |
| | ) | No.  22-JA-101 |
| | ) | |
| (The People of the State of Illinois, Petitioner- | ) | Honorable |
| Appellee, v. Sabrina M. and Deonte J., | ) | Mary H. Nader, |
| Respondents-Appellants). | ) | Judge, Presiding. |

| | | |
|---|---|---|
| *In re* S.M.J., a Minor | ) | Appeal from the Circuit Court |
| | ) | of McHenry County. |
| | ) | |
| | ) | No.  22-JA-67 |
| | ) | |
| (The People of the State of Illinois, Petitioner- | ) | Honorable |
| Appellee, v. Sabrina M. and Deonte J., | ) | Mary H. Nader, |
| Respondents-Appellants). | ) | Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court.
Presiding Justice Kennedy and Justice Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court's findings that the biological parents were unfit and that the termination of their parental rights was in the best interests of the children were not against the manifest weight of the evidence.

¶ 2    On September 5, 2024, the circuit court of McHenry County entered orders terminating the parental rights of respondents, Deonte J. (the father) and Sabrina M. (the mother), in their biological children, L.M. (born May 2020) and S.M.J. (born July 2022). Respondents filed separate appeals challenging the court's determination that they were unfit. Each parent also raises one additional issue on appeal. Specifically, the father challenges the court's decision that it was in the minors' best interests to terminate his parental rights, and the mother asserts that the court erred in taking judicial notice of the entire court file during the termination hearing. On our own motion, we consolidate the appeals for decision. We affirm.

¶ 3                                 I. BACKGROUND

¶ 4    On September 11, 2021, the State Central Registry received a call reporting that the father punched L.M. in the head during a domestic altercation, which caused a bruise on her forehead. It was also reported that the mother was "beat up" during the incident, and that there was chronic violence between the parents, which required a police response several times. There was also concern about substance abuse in the home, including concerns that the mother had abused her prescription Adderall.

¶ 5    On September 24, 2021, the State filed a petition for adjudication of wardship in Lake County case No. 21 JA 212 as to L.M., then age 16 months, alleging that she was a neglected minor in that her environment was injurious to her welfare, pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (705 ILCS 405/2-3(1)(b) (West 2020)). Specifically, the petition alleged that L.M.'s mother and father had a history of domestic violence and that the mother had a history of mental illness, which impacted her ability to care for L.M. The petition noted that the Department of Children and Family Services (DCFS) took L.M. into temporary protective custody the previous day.

¶ 6 After a shelter care hearing, the trial court found that the mother and father were served with notice of the hearing and were present in court. The court also found that there was probable cause to believe that L.M. was neglected based on the mother and father's history of domestic violence, which created an injurious environment for L.M, and DCFS had made reasonable efforts to prevent the need to remove the minor, but that there was an immediate need to remove L.M. from the home for her safety. It ordered that L.M. be placed in shelter care, and it granted DCFS temporary custody. L.M. was initially placed with her maternal great-grandparents, but her placement was changed after the supervising agency, Arden Shore Child & Family Services (Arden Shore), learned that the mother's biological father did not pass placement clearance and was living in the same residence. On November 4, 2021, L.M. was moved into a traditional foster home.

¶ 7 On November 30, 2021, the mother and father participated in an integrated assessment. Following a DCFS investigation, the father was indicated for L.M.'s forehead injury, and the mother was indicated for creating, by neglect, a substantial risk of physical injury or an environment injurious to L.M.'s health and welfare. The integrated assessment also noted prior DCFS involvement concerning L.M. and the mother's oldest child, M.M., who resided with her 50% of the time but is not a minor at issue in this appeal. Specifically, DCFS received a report on June 24, 2021, alleging that the father was suspected of selling cocaine out of the home and that the mother and father used cocaine in front of L.M. and M.M. It also noted that there was a concern that "physical altercations" between the mother and father were occurring in front of the children, and that there were holes in the walls caused by domestic violence. There was also a noted concern that alcohol and prescription medication were being abused in the home. Moreover, despite a court order prohibiting the father from being around M.M., police found him in the home, which raised

concerns that he continued to live there. The father was indicated for creating a substantial risk or an environment injurious to L.M.'s health and welfare through neglect. DCFS recommended that the father participate in an intimate partner violence assessment, trauma-focused individual therapy, parenting classes, and a substance abuse assessment, and that he abstain from substance use and participate in random drug screenings.

¶ 8    In July 2022, the mother gave birth to a third child, S.M.J., who is the biological child of respondent-father.

¶ 9    The State filed a petition for adjudication of wardship as to S.M.J. on July 29, 2022, in McHenry County case No. 22 JA 67. The State alleged that S.M.J. was neglected because her environment was injurious to her welfare (705 ILCS 405/2-3(1)(b) (West 2020)), and because she was a newborn infant whose blood, urine, or meconium contained controlled substances (*id*. § 2-3(1)(c)). The petition further alleged that S.M.J. was abused in that her parents created a substantial risk of physical injury to the minor (*id*. § 2-3(2)(ii)). Specifically, the State alleged that the mother had tested positive for illicit substances, including benzodiazepines, amphetamines, and cocaine, and that S.M.J. was born with amphetamines in her blood, urine, or meconium. It also alleged that the mother did not have custody of S.M.J's older sibling, L.M., due to prior acts of domestic violence between the mother and father, that the father had committed several acts of domestic violence against the mother, including committing batteries against the mother while she was pregnant with S.M.J. It also noted that the mother likewise did not have custody of M.M., as the child was turned over to his father pursuant to an order of protection, and the mother was allowed only supervised visitation with the child. It was reported that M.M., while in his mother's care, smelled strongly of burnt cannabis and tobacco, and school staff had observed a burn on his arm that was caused by the father. The mother was charged with child endangerment in McHenry

County for the incident that resulted in M.M's burn injury, and the father was charged with domestic battery against the mother in both McHenry and Lake County. The assessment noted that the father had not participated in any of the services recommended in L.M.'s case, and the mother had positive drug screenings and failed to consistently attend all services.

¶ 10    On September 29, 2022, the Lake County circuit court transferred case No. 21 JA 212, which pertained to L.M., to McHenry County, which it designated as case No. 22 JA 101.

¶ 11    DCFS completed a second integrated assessment on December 6, 2022. The assessment indicated that S.M.J's umbilical cord tested positive for OxyContin, which the mother asserted was prescribed by a dentist. It also noted that a hospital social worker had to stop the mother from breastfeeding S.M.J. in the hospital due to concerns about substances in the mother's bloodwork. As to the mother, the assessment recommended the following services: individual trauma-focused therapy, a psychiatric evaluation and medication management through a psychiatrist, substance abuse assessment and services as recommended, random drug screenings, and parenting coaching. As to the father, it was recommended that he participate in substance abuse services, random drug screenings, and trauma-focused individual therapy services, as well as that, once substance abuse services are completed, he participate in domestic violence perpetrator services and parenting education services. Further, once sobriety is achieved, it was recommended that the father participate in psychiatric services as recommended by his treatment team.

¶ 12    At March 2023 adjudication hearings, the mother and father stipulated that L.M. was neglected based on the parents' history of domestic violence and the mother's history of mental illness which impacted her ability to care for L.M. The mother and father likewise stipulated that S.M.J. was abused or neglected. Specifically, the mother stipulated that she tested positive for cocaine on February 15, 2022, that she did not have custody of her other children, that school staff

had observed a burn on M.M.'s arm that he reported was caused by respondent-father, that the father had committed several acts of domestic violence against the mother, including battering her while she was pregnant with S.M.J., and that the father was charged in both Lake and McHenry County for domestic battery against her. The father stipulated that the mother uses illicit controlled substances, that the mother gave birth to S.M.J. and the child's blood, urine, or meconium was positive for amphetamines, that the mother did not have custody of her other children, that the family had a history of cases with DCFS.

¶ 13    The trial court accepted the parties' stipulations and adjudicated L.M. and S.M.J. abused or neglected due to an environment injurious to their welfare. It further found that S.M.J. was abused or neglected in that she was a newborn exposed to illicit drugs. Additionally, it found that the parents needed outstanding services and admonished them to cooperate with DCFS and comply with the terms of the service plan in order to correct the conditions that caused the minors to come into care or risk termination of their parental rights.

¶ 14    On March 23, 2023, the trial court held a dispositional hearing. The State argued that the mother and father, for reasons other than financial circumstances alone, were unfit and unable to care for the minors. Without objection, the court entered a written order finding them unfit and unable to care for the minors and ordering them to comply with the service plan. Specifically, the father was ordered to maintain stable housing and employment, engage in substance abuse treatment, mental health treatment, trauma-informed parenting education, and domestic violence treatment, as well as submit to random drug screenings. The mother was ordered to maintain stable housing, engage in substance abuse treatment, domestic violence treatment, parenting education, and mental health treatment, as well as submit to random drug screenings. The court found that it was in the children's best interests to be made wards of the court, placed them under DCFS

guardianship, and continued their placement in traditional foster care. It set a permanency goal of return home within 12 months and admonished the parents to cooperate with DCFS and to comply with the terms of the service plan and correct the conditions that required the minors to be in care or risk termination of their parental rights.

¶ 15    In December 2022, DCFS prepared a service plan for the family. The plan noted that the parents denied any safety threats or risk factors. It noted that the father had completed a global evaluation but had not engaged in any services. It required him, pertinently, to: (1) complete a substance abuse assessment and follow all recommendations; (2) complete random drug drops; (3) engage in substance abuse services; (4) maintain a sober lifestyle and refrain from using illegal substances; (5) complete a mental health assessment and follow all recommendations; (6) attend individual therapy; (7) participate in trauma-informed parenting education classes; (8) complete a domestic violence assessment and follow all recommendations; (9) refrain from domestic violence incidents; (10) maintain contact with the caseworker; (11) provide proof of legal employment; (12) maintain stable housing; and (13) complete DNA testing.

¶ 16    Regarding the mother, the service plan noted that she was "involved in some services and has been referred for others." It required the mother, pertinently, to: (1) complete a substance abuse assessment and follow all recommendations; (2) complete all random drug drops; (3) complete a domestic violence assessment and follow all recommendations, (4) complete parenting classes; (5) complete a mental health assessment and follow all recommendations; (6) engage in individual therapy; (7) provide proof of employment; (8) maintain stable housing; (9) maintain consistent contact with the caseworker; and (10) sign all consents.

¶ 17    At permanency hearings in January 2023, July 2023, and January 2024, the trial court found that neither the mother nor the father had made reasonable efforts or reasonable and substantial

progress toward returning the children home. Because both parents were still in need of services, the court found that they were unfit and unable to care for the children. It also found that the services were appropriate and had been provided, and it set a permanency goal of return home within 12 months.

¶ 18    The June 2023 service plan rated the progress on the return home goal as unsatisfactory because neither parent had engaged in recommended services, and they both continued to struggle with sobriety, mental health, and domestic violence issues. The service plan noted that, although the father had completed his paternity testing and was determined to be the biological father of L.M. and S.M.J., he had failed to engage in any services concerning substance abuse, parenting, mental health, or domestic violence. He was also inconsistent with random drug drops, having failed to appear twice and testing positive for THC at the two drops that he did appear for, and the father admitted to consuming THC daily. The service plan also noted that the father had minimal contact with the agency, had not signed consent forms, was homeless, and failed to provide documentation of his employment. Concerning the mother, the service plan noted that she was unsuccessfully discharged from substance abuse treatment "due to not committing to treatment." She was rated unsatisfactory in random drug drops, in that she failed to appear for toxicology screenings six times, tested positive for benzodiazepines in March 2023, and tested positive for benzodiazepines, cocaine, THC, and amphetamines/methamphetamine in April 2023. The mother was also unsuccessfully discharged from parenting classes because she missed the final class and failed to commit to a makeup date. Similarly, she also had not engaged in mental health or domestic violence services, and she reported that there had been a recent domestic violence altercation between her and the father. The mother was also homeless and had not provided any documentation of employment.

¶ 19    The next service plan was completed in December 2023 which noted, pertinently, that the parents were both homeless and were involved in another domestic violence incident. According to the service plan, the father remained in contact with the caseworker and, although he reported being employed, he failed to provide proof of his employment. He also completed an intensive outpatient program (IOP) addressing mental health and substance abuse in October 2023, but he nevertheless either failed to appear for random drug screenings or continued to test positive for THC. He also completed a domestic violence evaluation through Renancer Latino, and it was recommended that he complete 26 classes. The father's visitation with the children, although nurturing and loving, was inconsistent due to transportation issues. He had not engaged in parenting education. Regarding the mother, the service plan noted that although she remained in contact with the agency and had signed consents for services, she was not participating in any services, despite having been referred for parenting, mental health, substance abuse, and domestic violence services. It noted, however, that she had completed a domestic violence evaluation and a global assessment for mental health, and it was recommended that she participate in 12 group sessions, but she had yet to participate. Except for one negative drug screen, the mother had failed to submit to any random drug screenings.

¶ 20    The June 2024 family service plan indicated that the parents had not made satisfactory progress toward the goal of return home. It noted that, although the father had maintained contact with the agency, he failed to provide any documentation as to his housing or employment. He also had not participated in trauma-informed parenting education classes despite being referred to Nicasa Behavioral Health Services, as well as Informed Choices. The plan noted that the father was eventually referred to Renancer Latino for parenting classes upon his request, but he failed to provide the agency with proof of engagement. It also noted that, in late January 2024, the father

was arrested in connection with another domestic violence incident with the mother, with whom he was still in a relationship. He was incarcerated until April 2024 and, during that time, he had no visitation with the children and participated in no random drug screenings. Even after his release, the father's visitation with the children was "inconsistent" and he had canceled visits "due to transportation issues," notwithstanding his receipt of gasoline cards. Following his release from jail, he was compliant with random drug screenings and tested negative for illegal substances. The plan also reiterated that, although the father had completed a domestic violence evaluation, he had yet to begin the 26 classes to which he was referred.

¶ 21    Regarding the mother, the June 2024 service plan noted that she remained in contact with the agency and had signed consent forms for services. Despite initiating services with Nicasa in November 2023 and completing a global evaluation, however, she was not involved in services. Specifically, she was unsatisfactorily discharged from substance abuse treatment, and it was recommended that she complete a new evaluation to determine which services were appropriate. She also failed to comply with all but one random drug screen, and the screen that she complied with, on January 16, 2024, "came back as adulterated and positive for Amphetamines/Methamphetamine." The service plan noted that, as a result, the court suspended the mother's visitation with the minors, and the agency required that she test negative for prohibited substances in three toxicology screenings for visitation to resume. She had also failed to provide the caseworker with documentation regarding her medication management, and she reported to the caseworker that she was "not taking any medication and knows she should be." The service plan noted that, although the mother had completed a domestic violence assessment, she failed to follow through with its recommendations because she did not engage in the recommended 12 group sessions for domestic violence victims. It also emphasized that the mother

and father were involved in another domestic violence incident, which occurred in January 2024. Although she obtained an emergency order of protection, she allowed the order to expire and continued to engage in a relationship with the father.

¶ 22    On July 3, 2024, following a permanency review hearing, the trial court changed the permanency goal from return home to substitute care pending termination.

¶ 23    The State filed petitions to terminate the father and mother's parental rights, alleging that they were unfit based on their failure to: (1) maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare (750 ILCS 50/1(D)(b) (West 2022)); (2) make reasonable efforts to correct the conditions that were the basis for removal of the minors during any nine-month period between March 9, 2023, to June 21, 2024 (*id.* § 1(D)(m)(i)); and (3) failure to make reasonable progress toward the return of the minors during that same period (*id.* § 1(D)(m)(ii)). Additionally, the State alleged that the mother had demonstrated an addiction to drugs, other than those prescribed by a physician, for at least one year prior to the commencement of the unfitness proceeding. *Id.* § 1(D)(k).

¶ 24    On September 5, 2024, the trial court conducted a hearing on the State's petitions. At the beginning of the proceeding, the State asked the court to take judicial notice of the items listed in People's Exhibit 1, which was a list of the petitions and orders concerning the instant case, as well as certain criminal complaints and court filings involving the parents. The mother objected to the court taking judicial notice of the first two items on the list, namely the petition for adjudication of wardship and the September 27, 2021, temporary custody order—both of which were from Lake County case No. 22 JA 212. The mother expressed doubt that the court could take judicial notice of those documents because they were not certified by the Lake County Clerk of the Circuit Court, but she stated that she had "no objection" to the court taking judicial notice of the McHenry County

court file. The State noted that both documents had been filed in the McHenry County cases such that they were "contained within this case file," and the mother reiterated that she had "no objection to what's contained in the McHenry County case files, having judicial notice being taken of that." In lieu of taking judicial notice of the State's itemized request, the court stated that it would take judicial notice of the minors' court files in their entirety. The father did not object during this exchange.

¶ 25    The State then called Jazmin Ortiz, an employee of Arden Shore, who testified as follows. Her involvement in the case evolved over time, beginning as a supervisor and later transitioning into the role of the primary caseworker. The case was initially handled by other caseworkers, including Olivia Collins, whom she had supervised beginning in February 2023. As Collins' supervisor, Ortiz ensured that proper procedures were followed and that the necessary court reports regarding the parents were prepared. However, when Collins left Arden Shore, Ortiz took over as the primary caseworker in May 2023 to maintain consistency in handling the case. When she took over as the caseworker, Ortiz familiarized herself with the case files by reviewing prior court documents, service plans, case notes, and supervisory notes.

¶ 26    Ortiz testified that L.M. came into care on September 23, 2021, and S.M.J. came into care on July 28, 2022—when she was just days old. Ortiz confirmed that the parents were interviewed and that two integrated assessments were prepared during the case, with reports from November 2021 and December 2022 being admitted into evidence without objection. She confirmed that the June 2023 permanency hearing had to be continued because referrals had not been appropriately provided, noting that the father had moved out of the county and asked to be re-referred for services in McHenry County. Updated referrals were provided for him in June and October 2023.

¶ 27    Ortiz further testified that, as part of her duties as the caseworker, she prepared progress reports regarding the parents and, as supervisor, she reviewed the reports prepared by the previous caseworker, Collins. The mother objected to the admission of the reports on the basis that an adequate foundation had not been laid, and the records did not qualify under the business records exception to the rule against hearsay. The court admitted the reports over the objection, noting that "they are in the court file" and it had "already taken judicial notice of the entire court file."

¶ 28    Ortiz also identified several DCFS service plans, which she described generally as plans created and periodically updated to evaluate the current goal, the parents' status with services, and the minors' circumstances in foster placement. Four such service plans, which Ortiz testified were prepared by a person with knowledge of the contents therein at or near the time of the occurrence of the events, were admitted without objection. She similarly testified that she prepared several permanency hearing reports, which she described as a report that "goes along with the service plan" and which evaluates the parents' progress in correcting the conditions that led to placement of a minor outside the home, among other things, in six-month increments. Two such reports were admitted into evidence without objection.

¶ 29    Ortiz testified that the mother had not completed any of the recommended service tasks outlined in the most recent service plan. Specifically, she had not completed domestic violence, mental health, psychiatric, substance abuse, parenting, and parenting coaching services, despite being referred for those services "multiple times," including in 2021, February 2023, and June 2023. She further explained that the mother had engaged a "co-occurring group" through Nicasa. The mother was discharged unsuccessfully, however, due to unsatisfactory attendance and falling asleep during the group sessions. A meeting was held to reengage the mother in those services in May 2024. She also engaged in parenting classes through Nicasa, but she was discharged

unsuccessfully after failing to complete one class. Ortiz testified that she had contacted Nicasa about the outstanding class and was informed that the mother was given "plenty of opportunities to complete that last class, including doing it online or over the phone, [but] she failed to do so." The mother also never contacted her psychiatric referrals or any other provider of such services through her health insurance.

¶ 30    Regarding the father, Ortiz testified that he still needed to complete domestic violence services, refrain from further altercations, be consistent with visitation, and provide documentation regarding his housing and employment. She explained that the father was referred for 26 domestic violence classes and, although he started them in January 2024, he was unable to attend those services due to his incarceration following another domestic violence incident. She further explained that the service provider allowed him to reengage in the domestic violence services once he was released from jail, and he resumed taking the classes in June 2024. As of the date of the termination hearing, the father had attended 12 of the required 26 domestic violence classes. Ortiz also testified that the father tested positive for THC during his drug screening but failed to provide her with any medical documentation. She noted that although the father had completed parenting services, an additional recommendation of parenting coaching was added in July 2024 because of observations during his visitation with the minors. The State rested after Ortiz concluded her testimony. Neither the mother nor the father presented any evidence at the unfitness hearing.

¶ 31    After oral arguments, the trial court found that the State proved, by clear and convincing evidence, that neither parent made reasonable efforts or reasonable progress during any nine-month period between March 9, 2023, and June 21, 2024. As to the mother, the court noted that her visitation was suspended because of her drug use, noting that she had tested positive for illegal substances several times within "a very short period" and was recently charged with possession of

a controlled substance. It also found that the mother had not shown a reasonable degree of interest, concern, or responsibility for the minors because, even prior to the suspension, she had not visited the children in quite some time, and "[s]o it wasn't just the Court order that stopped her from seeing her children. It was her own volition." It also noted that the mother "had trouble with her feeding [L.M.] in spite of [her] allergies, which obviously was not in [L.M's] best interests." The court also noted that the mother had "instability" in her housing and employment.

¶ 32    As to the father, the court noted that despite completing an IOP on October 23, 2024, he continued to test positive for THC. Similarly, although he had started domestic violence services, he engaged in acts of domestic violence while he was participating in those services. He also did not have stable housing or employment. The court found that the father had not shown interest, responsibility, or concern because of his three-month incarceration for domestic violence which prevented his visitation, his struggle to appropriately feed L.M. to avoid her allergies, and his failure to re-engage in domestic violence counseling services until after the State had filed a petition to terminate his parental rights.

¶ 33    There were also no issues with the case management or referrals, which were appropriately made and reissued upon request. It also emphasized that the same caseworker and supervisor had been assigned since February 2023, ensuring consistency. In determined that both parents failed to provide the stability, care, and concern required for the well-being of the children, it stated that "[n]obody has a home," and that the children needed both home stability and parents that were not drug addicted or domestically violent. The trial court found that both the mother and the father were unfit as parents for L.M. and S.M.J.

¶ 34    The cases immediately proceeded to a best interests hearing. The State asked the court to take judicial notice of the evidence and testimony from the fitness hearing, which the court granted

without objection. Caseworker Ortiz testified that L.M. came into care on September 23, 2021, and S.M.J. came into care on July 28, 2022. Ortiz attempted to locate other maternal family members but received no useful contact information from the mother. The father gave Ortiz contact information for his mother and sister, but his mother never returned Ortiz's message, and his sister stated that she did not have room for the children. As such, L.M. moved to her current placement on November 4, 2021, and S.M.J. was moved into the same foster home a few days after her birth. Ortiz noted that soon after joining L.M. in the foster home, S.M.J. contracted herpes. Despite investigating the diagnosis, Ortiz could not determine its origins. However, the foster parents diligently followed up on medical care and had worked to manage the condition.

¶ 35 Ortiz observed the minors in their foster home, who were "strongly bonded" to their foster parents and their foster sister. They referred to their foster parents as "mom" and "dad," and referred to the foster sister as their "sister." Ortiz testified that the children appeared happy and well-adjusted in the foster home, often smiling and showing affection toward their caregivers. The children were "thriving" in their current placement, and their foster parents were staying up to date on their medical care and meeting their developmental needs. Further, the foster parents ensured that L.M. did not eat foods that contained any allergens that she could not handle. The minors' natural parents sometimes would bring food that would cause L.M. to have an allergic reaction, and so the foster parents packed appropriate meals for L.M. in order to avoid allergic reactions.

¶ 36 Ortiz testified there had been little progress toward the goal of reunification with the children's biological parents, as L.M.'s case began in 2021 in Lake County before it was transferred to McHenry County in 2022 and there were two "failed permanency hearings." Believing that the children needed stability and permanency, Ortiz submitted a legal screening packet, which was admitted into evidence without objection.

¶ 37    Ortiz testified that the foster parents were committed to adopting L.M. and S.M.J, and she opined, based on her experience as a caseworker, that it was in their best interests that the mother and father's parental rights be terminated. Because both minors had resided with their foster family beginning at very tender ages, the foster parents were "all they know." While the foster parents expressed concerns about having visits with the children's maternal half-brother, M.M., because they feared that the mother would join those visits, they were willing to contact M.M.'s father to discuss facilitating such visitation in the future. Ortiz testified that she had attempted to arrange such visits herself, but she was unable to come to an agreement with M.M.'s father.

¶ 38    Christopher McAlpine testified that he served as the Court Appointed Special Advocate (CASA) assigned to the minors. He explained that he had been assigned to L.M. and S.M.J.'s case approximately two years earlier and had visited them frequently, making observations in their foster home "many times." During his visits, the children appeared "very happy." They enjoyed playing games, and they played age-appropriate games in the foster home and in the backyard. McAlpine observed a "very loving *** [and] parental-type of a relationship" between the foster parents and the minors. He noted that the foster parents used redirection when one of the children expressed age-appropriate anger related to sharing toys. The foster parents also demonstrated emotional support and attentiveness to the children's needs. McAlpine described the foster father as "very caring and loving" with the children, often comforting the children if they cried. Similarly, he testified that the foster mother displayed the same nurturing behavior, and she always put sunscreen on the children before the children went outdoors to play. Additionally, she ensured that the children attended all doctor appointments, scheduled visits, and other necessary commitments. McAlpine ultimately opined that the children were "in a very loving environment" in the foster home and that "they would do very well there."

¶ 39    The minors' foster parents also testified at the hearing. The foster mother testified that she lived in a home with her husband, the minors, and one other three-year-old child. Everyone got along "well" in the home. While the children occasionally fought, they also experienced moments of close connection and affection. The three children loved each other and were "very much a unit," interacting like "typical sisters." The foster mother further testified that she was a stay-at-home parent and cared for the children while her husband, the foster father, was at work. However, she planned to work outside the home once the children begin school. They also had an extensive extended family on both sides, because the foster father was one of 14 children, and the foster mother had a sister who had five children. There were many cousins for the minors to play with. Both foster parents testified that they were committed to raising L.M. and S.M.J. as their own children and expressed a desire to adopt them if given the opportunity.

¶ 40    Following argument, the trial court found that it was in the best interests of L.M. and S.M.J to terminate the mother and father's parental rights. In reaching its decision, it recounted the testimony from the best interests hearing. It noted that L.M. had been in care since 2021, or "nearly three years," and S.M.J. had been in care since birth. During this time, the children had been with the same foster family, with whom they had formed a close bond. The court highlighted that the children were current in their medical care and that the foster parents were careful to avoid L.M.'s food allergies and provided her with appropriate meals. It noted that it had reviewed the legal screening report and that the foster parents were willing to adopt them. The court also found that there were no suitable family members willing to take the children. Based on the evidence, the court determined that the State had proven by a preponderance of the evidence that it was in the best interests of L.M. and S.M.J. to terminate both parents' parental rights, and it changed the goal to substitute care pending adoption. Both parents timely filed a notice of appeal.

¶ 41                                    II. ANALYSIS

¶ 42     On appeal, both the mother and the father challenge the trial court's judgments terminating their respective parental rights to L.M. and S.M.J., arguing that the State failed to prove their unfitness by clear and convincing evidence. The father additionally argues that the court erred in finding that the State proved by a preponderance of the evidence that it was in the best interests of the children to terminate his parental rights. The mother does not challenge the court's best interests determination. We begin by outlining the legal framework that guides our review of the arguments presented by the parties' briefs.

¶ 43     The Juvenile Court Act, in conjunction with the Adoption Act, establishes a two-step process for the involuntary termination of parental rights, which constitutes a permanent and complete severance of the parent-child relationship. *In re C.N.*, 196 Ill. 2d 181, 208 (2001). Under this bifurcated procedure, the State must first prove by clear and convincing evidence that the parent is an "unfit person" as that term is defined in section 1(D) of the Adoption Act. 750 ILCS 50/1(D) (West 2022)). While this section provides several grounds under which a parent may be found unfit, any one ground, properly proven, is sufficient for a finding of unfitness. *In re C.W.*, 199 Ill. 2d 198, 210 (2002). The determination of parental unfitness necessarily involves factual findings and credibility determinations which the trial court is better suited to make because "the trial court's opportunity to view and evaluate the parties *** is superior." (Internal quotation marks omitted.) *In re M.I.*, 2016 IL 120232, ¶ 21. Although case law may be useful, each case concerning parental unfitness is *sui generis*, unique unto itself, and must be determined based on its own facts and evidence. *In re Adoption of Syck*, 138 Ill. 2d 255, 279 (1990).

¶ 44     If the trial court finds the parent unfit under at least one of the enumerated grounds, the proceeding then moves to the second step, where the burden is on the State to prove by a

preponderance of the evidence that it is in the best interests of the child that parental rights be terminated. *Id*. at 276. At the best interests hearing, the formal rules of evidence do not apply, but rather, "all evidence helpful (in the court's judgment) in determining the questions before the court may be admitted and may be relied upon to the extent of its probative value, even though that evidence would not be admissible in a proceeding where the formal rules of evidence applied." *In re Jay H.*, 395 Ill. App. 3d 1063, 1070 (2009).

¶ 45    A reviewing court will not disturb the trial court's factual findings on the issues of unfitness and best interests of the minor or minors unless they are against the manifest weight of the evidence. *C.W.*, 199 Ill. 2d at 211. This is a deferential standard of review. Only if the record shows that it is clearly apparent that the trial court should have reached the opposite conclusion should the court's decision be deemed against the manifest weight of the evidence. *In re N.G.*, 2018 IL 121939, ¶ 29.

¶ 46    Accordingly, we first consider whether it is clearly apparent that the State failed to prove, by clear and convincing evidence, that respondents satisfy any of the enumerated unfitness grounds in section 1(D) of the Adoption Act and specified in the petitions to terminate parental rights.

¶ 47                            A. The Father's Unfitness

¶ 48    As noted, section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)) provides several grounds under which a parent may be found unfit, any one of which, if properly proved, is sufficient to affirm. *M.I.*, 2016 IL 120232, ¶ 43. Here, the father was found unfit under three statutory grounds, namely that he failed to: (1) maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare (750 ILCS 50/1(D)(b) (West 2022)); (2) make reasonable efforts to correct the conditions that were the basis for the removal of the children during any nine-month period between March 9, 2023, and June 21, 2024 (*id*. § 1(D)(m)(i)); and

(3) make reasonable progress toward return of the children during that same nine-month period (*id*. § 1(D)(m)(ii)). The father challenges all three grounds on appeal. However, because we choose to dispose of this case based on the father's arguments relating to the trial court's unfitness finding predicated on his failure to make reasonable progress, we need not address his other arguments related to fitness.

¶ 49 Section 1(D)(m)(ii) provides that a parent is unfit if he or she fails "to make reasonable progress toward the return of the child during any 9-month period following the adjudication of neglect." *Id*. § 1 (D)(m)(ii)). When determining whether a parent has made reasonable progress, the trial court may only consider evidence of the parent's conduct that falls within the relevant statutory timeframe. Under an objective standard, reasonable progress requires, at a minimum, "measurable or demonstrable movement" toward the goal of reunification. *In re Daphnie E.*, 268 Ill. App. 3d 1053, 1066 (2006). The benchmark for measuring reasonable progress "encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *C.N.*, 196 Ill. 2d at 216-17. Still, courts must be mindful that compliance with the service plan is a means to a desired end, and not the end in itself. *In re Gwynne P.*, 346 Ill. App. 3d 584, 597 (2005). "Reasonable progress exists when the trial court can conclude that it will be able to order the child returned to parental custody in the near future." *In re A.S.*, 2014 IL App (3d) 140060, ¶ 17.

¶ 50 The State, in its petition to terminate the father's parental rights, identified the period as any 9-month period between March 9, 2023, to June 21, 2024. On appeal, the father initially contends that the period from adjudication (March 9, 2023) to June 23, 2023, should not be considered in assessing whether he made reasonable progress because, following the June 2023

permanency hearing, the court entered a written finding that the agency had not made reasonable efforts. Accordingly, the father contends that the "analysis for reasonable progress should be limited to June 23, 2023[,] through June 21, 2024."

¶ 51 The State responds that the father has forfeited this contention because he failed to support it with citation to legal authority. See Ill. Sup. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (requiring that argument contain the contentions of the appellant and the reasons therefore, with citation of the authorities relied on). Additionally, the State emphasizes that the father failed to include in the record either a transcript or an acceptable substitute from the June 2023 permanency hearing, which it asserts is necessary to evaluate the father's claim. Specifically, the State points to the trial court's notation that its finding that the agency had not made reasonable progress was "based on pre-trial discussion with the parties," and it notes that the order merely directed the agency to facilitate physician's visits for the minors and to update reports prior to the next court date. See *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (the appellant bears the burden of providing a sufficient record on appeal to support a claim of error, and any doubts arising from an incomplete record are resolved against the appellant). We need not resolve the father's contention, however, because the State limits its argument in this section of its appellate brief to defendant's desired timeframe.

¶ 52 The trial court's finding that the father failed to make reasonable progress, even within the time frame identified by the father, is amply supported by the evidence. Here, the evidence demonstrates that the father failed to make reasonable progress, meaning demonstrable movement toward the goal of reunification, during this period. Although he participated in some of the services outlined in the service plan, his overall progress was inconsistent, incomplete, and insufficient to demonstrate that the children could be returned to him within the near future.

¶ 53    Foremost, the father's participation in domestic violence services was inadequate. Following his completion of a domestic violence assessment, it was recommended that he attend 26 class sessions for domestic violence services for perpetrators.  The father attended just two classes before he was arrested and incarcerated following another domestic violence incident against the children's mother in late January 2024.  He participated in no services while he was incarcerated.  See *In re J.L.*, 236 Ill. 2d 329, 341 (2010) (time spent incarcerated does not toll the nine-month period); and *In re Nevaeh R.*, 2017 IL App (2d) 170229, ¶ 21 ("[t]he mere fact of incarceration is not evidence of failure to make reasonable progress").  Then, when the father was released in April 2024, he did not re-engage in those domestic violence services until June 2024, which is at the very end of the relevant 9-month period.  The father points out that, by the time of the termination hearing in September 2024, he had attended 12 of the 26 required classes which, in his view, "further demonstrate[es] his commitment to meeting the requirements necessary for the return of his children."  While the father did increase his participation in this service after he was released from incarceration, courts have consistently held that a "flurry of activity" immediately before the hearing on the petition to terminate does not outweigh months of minimal effort or noncompliance.  *In re A.P.*, 227 Ill. App. 3d 592, 599 (1996).  Given that domestic violence against the mother and L.M. was a leading factor in the children's removal, the father's failure to sufficiently address this issue and, indeed, his ongoing domestic violence against the mother, severely undercuts any claim of reasonable progress.

¶ 54    Additionally, the father lacked stable housing and employment throughout the relevant period.  The trial court properly noted that, in addition to having parents who were not violent, the children needed stability and a home, but the father did not have a home.  Instead, the evidence demonstrated that the father "couch surf[ed]" throughout the duration of the proceedings.  Because

the father had failed to demonstrate that he had adequate, stable housing or employment by June 2024, reunification was not a realistic possibility in the near future.

¶ 55   The father also failed to participate in trauma-informed parenting education classes despite being referred to Nicasa and Informed Choices.  He was eventually referred to Renancer Latino for parenting classes upon his request, but he failed to provide any proof of engagement.

¶ 56   The father points to his completion on October 23, 2023, of an intensive outpatient program, which he describes as a "critical milestone that directly addresses [his] substance and mental health issues."  Completion of an IOP is certainly laudable.  However, as noted by the trial court, the father continued to test positive for THC and was charged with unlawful possession of cannabis in 2024 after his completion of the IOP.  Only after his release from incarceration in April 2024 did the father begin to test negative for prohibited substances.  Put simply, the father's failure to remain drug-free indicates that he had not meaningfully addressed the substance abuse issues that contributed to the children's removal.

¶ 57   Although the father completed some of the services he was required to engage with, merely showing up, going through the motions, and checking off boxes is not enough to establish reasonable progress.  *In re Dar. H.*, 2023 IL App (4th) 230509, ¶ 59.  Rather, he needed to internalize and apply what he learned to create a safe and stable home for his children.  *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 56.  Notwithstanding the father's participation in services and completion of some of them, his continued violence toward the mother, his drug use, and his unstable employment and housing situation, show that his progress was not of sufficient quality to indicate that reunification was likely to occur in the near future.  His behaviors were simply unchanged since L.M. and S.M.J. came into care, despite engaging in some of the recommended services, and he was no closer to reunification than he was at the beginning of the case.

Accordingly, based on the evidence presented at the termination hearing, we cannot say that the trial court's finding that the father failed to make reasonable progress, meaning demonstrable movement toward the goal of reunification, was against the manifest weight of the evidence.

¶ 58                                    B. The Mother's Unfitness

¶ 59     As a preliminary matter, we first address the mother's argument that the trial court erred in taking judicial notice of the entire court file and relying on inadmissible hearsay. Although the mother presents this argument last in her brief, we find it necessary to resolve this issue before considering the merits of her claim regarding her unfitness.

¶ 60     During an unfitness hearing, the trial court must consider key facts regarding the progression of the case to the point at which the State seeks to terminate parental rights. This includes understanding the specific steps the parent was required to take to achieve reunification with the child and when the timeframe for completing those steps began. *In re J.G.*, 298 Ill. App. 3d at 628-29. To that end, a judge presiding over the fitness portion of a termination proceeding will often take judicial notice of some portion of the court file. *In re M.D.* 2022 IL App (4th) 210288, ¶ 79. This includes matters of record in its own proceedings, including its own orders. *Id.* ¶ 80. Nevertheless, it is well established that wholesale judicial notice of all the documents in the court file or the events that occurred prior to an unfitness hearing is both unnecessary and inappropriate. *In re Z.J.*, 2020 IL App (2d) 190824, ¶ 71 (citing *J.G.*, 298 Ill. App. 3d at 629). This is because the court's determination of parental fitness should be based only upon evidence that has been properly admitted at the fitness hearing, rather than, for example, evidence presented during a permanency hearing, where the formal rules of evidence do not apply. *M.D.*, 2022 IL App (4th) ¶¶ 81-86. The appellate court has delineated the proper procedure for taking judicial notice within the context of parental fitness proceedings:

"If the State wishes the trial court to take judicial notice of portions of the court file in a particular unfitness proceeding, the State can make a proffer to the court of the material requested to be noticed. Defense counsel should then be allowed an opportunity to object to the State's request. Such a procedure would serve to focus the trial court's attention on only those matters that are admissible under the rules of evidence, as well as make it easier for a reviewing court to determine what the trial court actually relied on in making its decision of unfitness." *J.G.*, 298 Ill. App. 3d at 629.

¶ 61 This is precisely what occurred in this case. The following exchange transpired at the hearing:

"MS. NESBIT [(ASSISTANT STATE'S ATTORNEY)]: Thank you, your Honor. First, I do have an exhibit list I can tender to your Honor and the parties. And then I do have People's Exhibit 1 titled judicial notice, which I've listed what I'm going to be asking the Court to take judicial notice of. If I can approach and tender them?

THE COURT: Yes, please.

MR. WINDON [(MOTHER'S COUNSEL)]: Thank you.

THE COURT: So let's start with People's Exhibit 1. It's just for demonstrative purposes. Could you all review the things that the State is asking me to take judicial notice of and tell me if you have any objections.

MR. WINDON: I'd ask for – point of clarification, all case numbers are McHenry County unless otherwise noted the ones that are Lake County; is that correct, counsel?

MS. NESBIT: Yes.

MR. WINDON: All right. Your Honor, I would object to the court taking judicial notice of 1 ["9/24/21 Petition for Adjudication of Wardship in 22JA101"] and 2 ["9/27/21

Temporary Custody Order in 22JA101"], as they are Lake County cases. I don't think we can take judicial notice of those here without a certified copy of those filings from Lake County. I have no objection to the judicial notice of the McHenry County court files.

THE COURT: Have *** 1 and 2 ever been filed in this case file?

MS. NESBIT: Yes.

THE COURT: So they're contained within this case file?

MS. NESBIT: They are.

MR. WINDON: I'd have no objection to what's contained in the McHenry County case files, having judicial notice being taken of that.

THE COURT: All right. So in lieu of 1 and 2, will be [*sic*] I'll take judicial notice of 2022 JA 67 and 2022 JA 101 in its entirety."

¶ 62     As reflected in this exchange, the State asked the trial court to take judicial notice of items it had listed in People's Exhibit 1, including petitions, court orders, and certain criminal complaints related to the parents. The mother specifically objected to the court taking judicial notice of two items that were filed in Lake County—the petition for adjudication of wardship and the temporary custody order entered on September 27, 2021—on the grounds that they were not certified by the circuit clerk. However, she expressly volunteered that she had "no objection" to taking judicial notice of the McHenry County case files. Under the invited error doctrine, a party may not request to proceed in one manner and then argue on appeal that the requested action was in error. *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004). "The rationale for the rule is that it would be manifestly unfair to grant a party relief based on error introduced into the proceedings by that party." *Gaffney v. Board of Trustees of Orland Park Fire Protection District*, 2012 IL 110012, ¶ 57. Here, the mother did not merely acquiesce to proceeding in this fashion, but rather, she was

- 27 -

the party who initially proposed that the court take judicial notice of the entire court file. This is exactly why the court later overruled the mother's objection to the admission of the Arden Shore progress reports, explaining that those documents were "in the court file and [it] had already taken judicial notice of the entire court file based on your request." Given the mother's affirmative, unprompted assertion that she had "no objection" to taking judicial notice of the entire McHenry County case file, she cannot now claim that the trial court committed reversable error by following her request.

¶ 63 Even setting aside the mother's invited error, we would find no reversible error. The admission of evidence is within the discretion of the trial court, and its rulings will not be disturbed on appeal absent an abuse of that discretion. *In re V.T. III*, 306 Ill. App. 3d 817, 819 (1999). The record shows that the State asked the court to take judicial notice of several petitions, complaints, and orders, all of which were the proper subject of judicial notice. See *M.D.* 2022 IL App (4th) 210288, ¶ 79. Moreover, the integrated assessments and service plans were admissible as business records. 705 ILCS 405/2-18(4)(A) (2022); *Z.J.*, 2020 IL App (2d) 190824, ¶¶ 53-54. Importantly, the record does not affirmatively demonstrate that the court considered any inadmissible evidence in making its fitness determination. The mother argues that, because the trial court commented that it had read all the reports and heard all the evidence and testimony in the case, then it improperly relied on inadmissible evidence in rendering its fitness determination. However, she identifies no inadmissible evidence on which she believes the trial court improperly relied. In the absence of an affirmative showing to the contrary in the record, the trial court is presumed to know the law and apply it properly. *In re B.S.*, 2022 Il App (2d) 220271, ¶ 58.

¶ 64 We now turn to the unfitness case against the mother and conclude that there was sufficient evidence, properly admitted, of the mother's unfitness to sustain the trial court's finding. As noted

above, section 1(D) of the Adoption Act provides several grounds under which a parent may be found unfit, and any one ground, properly proven, is sufficient for a finding of unfitness. *C.W.*, 199 Ill. 2d at 210. The determination of parental unfitness necessarily involves factual findings and credibility determinations which the trial court is better suited to make because "the trial court's opportunity to view and evaluate the parties *** is superior." (Internal quotation marks omitted.) *M.I.*, 2016 IL 120232, ¶ 21.

¶ 65 Here, the trial court found the mother unfit under four statutory grounds, namely that she: (1) failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the children (750 ILCS 50/1(D)(b) (West 2022)); (2) failed to make reasonable efforts to correct the conditions that were the basis for the removal of the children during any nine-month period between March 9, 2023, and June 21, 2024 (*id*. § 1(D)(m)(i)); (3) failed to make reasonable progress toward the return of the children during that same period (*id*. § 1(D)(m)(ii)); and (4) was addicted to drugs, other than those prescribed by a physician, for at least one year immediately prior to the commencement of the unfitness proceedings (*id*. § 1(D)(k)).

¶ 66 We cannot say that the trial court's finding that the mother failed to make reasonable progress during the applicable period, which the State identified in its petition as any nine-month period between March, 9, 2023, and June 21, 2024, was against the manifest weight of the evidence. As noted above, the benchmark for measuring reasonable progress "encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *C.N.*, 196 Ill. 2d at 216-17. Here, there was ample evidence that the mother did not complete critical services, was unsuccessfully discharged from multiple programs, and continued to engage in

substance abuse, which was a primary reason for the children's removal from her care. Ortiz testified that the mother began services in 2021 with the prior management team. Although she engaged in some services, including mental health and substance abuse treatment with a co-occurring group through Nicasa, she was discharged unsuccessfully due to unsatisfactory attendance and falling asleep during the sessions. Additionally, she did not follow through with psychiatric referrals, failed to provide verification of stable housing and employment, and either missed her random drug screenings or tested positive for controlled substances throughout the proceedings. Her ongoing drug use was so persistent that the court suspended her visitation until she could produce three consecutive negative drug screenings—something that never occurred.

¶ 67    Aside from completing a domestic violence assessment, maintaining contact with the agency, and signing all consent forms, the evidence demonstrated that the mother failed to complete any of the recommended service tasks outlined in her service plan, despite multiple referrals. As a result, critical services—including domestic violence counseling, mental health treatment, psychiatric care, substance abuse treatment, parenting education, and parenting coaching—remained incomplete. Given her failure to complete any of the services that were designed to facilitate reunification with her children, the trial court's finding that she was unfit for failing to make reasonable progress during the applicable period was not against the manifest weight of the evidence.

¶ 68                                C. Best Interests

¶ 69    We next turn to the question of whether it was in the best interests of the children to terminate the father's parental rights.[1] Specifically, the father argues on appeal that the trial court failed to adequately consider his constitutional rights as a parent and the "systemic barriers that

---

[1]The mother does not challenge the trial court's best interests determination.

hindered his ability to bond with his children and demonstrate progress." He points to the transfer of L.M.'s case from Lake to McHenry County and the court's finding in June 2023 that it was unable to find that the agency had made reasonable efforts, as well as the agency's decision to suspend his visitation during his three-month incarceration in early 2024, which, "however well-intentioned, deprived [him] of opportunities to maintain consistent contact with his children."

¶ 70    The father's argument is not well taken because it overlooks that the focus at the best interests stage of the proceedings is not on his interests as a parent, but rather, on "the child's welfare and whether termination would improve the child's future financial, social and emotional atmosphere." *In re D.M.*, 336 Ill. App. 3d 766, 772 (2002). Courts must consider certain statutory factors in making a best interests determination, namely: (1) the physical safety and welfare of the child, including food, shelter, health, and clothing; (2) the development of the child's identity; (3) the child's familial, cultural, and religious background and ties; (4) the child's sense of attachments; (5) the child's wishes and long-term goals; (6) the child's ties to the community; (7) the child's need for permanence and stability; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of those available to care for the child. 705 ILCS 405/1-3(4.05) (West 2022).

¶ 71    The trial court's finding that it was in the best interests of the children to terminate the father's parental rights was not against the manifest weight of the evidence. Ortiz testified during the best interests hearing that L.M. entered care in September 2021 and S.M.J. only a few days after her birth in July 2022. The father supplied contact information for his mother and sister, but his mother never returned Ortiz's message, and his sister indicated that she lacked space for the children. Consequently, L.M. was moved to her current foster home in November 2021 and S.M.J. joined her there shortly after birth. Ortiz testified that the children had remained in their foster

home for nearly their entire time in care and had become "strongly bonded" to their foster parents and foster sister. They referred to their foster parents as "mom" and "dad" and displayed affection and happiness in their environment. The foster parents also ensured that L.M. did not consume any foods containing allergens that could harm her. The foster parents, according to Ortiz, is "all [the children] know," and they were committed to adopting the children. McAlpine, who had been assigned to the minors' case for approximately two years, echoed Ortiz's testimony. Having visited the children frequently in their foster home, McAlpine observed that they appeared "very happy" and well-adjusted. They engaged in age-appropriate games, played together in the backyard, and demonstrated a strong attachment to their foster parents. He ultimately opined that the children were "in a very loving environment" in the foster home and that they would thrive there.

¶ 72    The foster parents likewise testified to their commitment to raising L.M. and S.M.J. as their own. The foster mother, a stay-at-home parent, cared for the children full-time while her husband worked, though she intended to seek employment once the children started school. Their home included one other child, a three-year-old, and the three children interacted together like "typical sisters." They also had an extensive extended family, providing additional support and playmates for the minors. Both foster parents expressed a strong desire to adopt L.M. and S.M.J. and were willing to provide them with a permanent home.

¶ 73    In making its best-interests determination, the trial court appropriately recounted the testimony from the hearing that bore on the statutory factors, highlighting the close bond that the children had with their foster family, as well as that the children were thriving in their foster placement. Considering this evidence, the trial court's finding that it was in the best interests of

the minors to terminate the father's parental rights was not against the manifest weight of the evidence.

¶ 74　　　　　　　　　　　　　　III. CONCLUSION

¶ 75　　For the reasons stated, we affirm the judgments of the circuit court of McHenry County.

¶ 76　　Affirmed.